**Patricia CORNWALL, Appellant,**

**v.**

**STATE of Alaska, Appellee.**

**No. A–05410.**

Court of Appeals of Alaska.

Feb. 16, 1996.

Marcia E. Holland, Assistant Public Defender, Fairbanks, and John B. Salemi, Public Defender, Anchorage, for Appellant.

James L. Hanley, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

*Opinion*

As Reviewed on Rehearing

Before BRYNER, C.J., and COATS and MANNHEIMER, JJ.

MANNHEIMER, Judge.

Patricia A. Cornwall appeals her convictions for interference with official proceedings, AS 11.56.510(a), and first-degree custodial interference, AS 11.41.320(a). For the reasons explained in this opinion, we reverse Cornwall's conviction for custodial interference and we call for supplemental briefing on the question of whether we should also reverse Cornwall's conviction for interference with official proceedings.

*Underlying Facts*

On April 5, 1993, the Division of Family and Youth Services [DFYS] of the Alaska Department of Health and Social Services received a report that Cornwall's thirteen-year-old daughter, A.H., had been sexually abused by her stepfather, State Trooper David Cornwall. On the morning of April 6th, Sonja Ward (a DFYS social worker) and three state troopers (Sergeant McCann, Investigator Hunyor, and Investigator Dahlke) went to the Cornwall residence in Fairbanks to investigate the report.

Patricia Cornwall was home when Ward and the three troopers arrived. Sergeant McCann explained to Cornwall that they needed to interview A.H. Cornwall became upset, fearing that DFYS was going to remove A.H. from her home. Initially, Cornwall ordered Ward and the troopers to leave her house, but eventually Cornwall agreed to let the troopers interview A.H. During this interview, A.H. revealed that David Cornwall had sexually abused her for several years.

After the interview, Investigator Hunyor told Cornwall what A.H. had said. Cornwall indicated that she already knew of the abuse: apparently, the day before, David Cornwall had admitted to her that he had sexually abused A.H.; she had ordered him to leave the house.

After the interview with A.H., Ward decided to take emergency custody of A.H. under AS 47.10.142(a) [1], but she also decided to let A.H. stay with Patricia Cornwall for the time being. Ward told Cornwall that she was leaving A.H. with her on the condition that she not allow David Cornwall back into the home. Ward also explained that a court hearing would take place within the next 48

---

1. This statute reads:

The Department of Health and Social Services may take emergency custody of a minor upon discovering any of the following circumstances:

(1) the minor has been abandoned;

(2) the minor has been grossly neglected by the minor's parents or guardian, as "neglect" is defined in AS 47.17.290, and the department determines that immediate removal from the minor's surroundings is necessary to protect the minor's life or provide immediate necessary medical attention;

(3) the minor has been subjected to child abuse or neglect by a person responsible for the minor's welfare, as "child abuse or neglect" is defined in AS 47.17.290, and the department determines that immediate removal from the minor's surroundings is necessary to protect the minor's life or that immediate medical attention is necessary; or

(4) the minor has been sexually abused under circumstances listed in AS 47.10.010(a)(2)(D).

hours, and that she would contact Cornwall with the details. Later that same day, the authorities arrested David Cornwall.

After Ward and the state troopers left, Patricia Cornwall retained an attorney, Marc Grober, and met with him in Nenana the following day (April 7th). At this meeting, Grober told Cornwall that he believed the State had not lawfully taken emergency custody of A.H. because Ward had not taken physical custody of A.H. and had not served Cornwall with any court documents. When Cornwall asked if she could take A.H. and leave Fairbanks, Grober told her that she was free to do so.

The next day (April 8th), Cornwall took A.H. and her other children and moved to Palmer. Cornwall remained in contact with Grober, but she hid from the state authorities. Cornwall told A.H. never to reveal the names of the people with whom they were staying because these people would get in trouble for hiding them. Cousins of David Cornwall from Michigan, the Trowbridges, sent Cornwall support money while she was in hiding.

During their stay in Palmer, A.H. overheard Cornwall talking to a friend about a "120-day rule". From this conversation, A.H. gathered that if she was not back in Fairbanks in 120 days, the criminal case against David Cornwall would be dismissed.

In July, Cornwall left Alaska with A.H. and her other children. Traveling under assumed names, they moved to Michigan, where they lived on a farm owned by the Trowbridges. While living there, A.H. and her brothers were not allowed to answer the phone; Cornwall herself would answer the phone only after receiving a special code.

In the meantime, back in Fairbanks, the State initiated Child In Need of Aid [CINA] proceedings to obtain formal custody of A.H. On April 7, 1993 (the day Cornwall first met with attorney Grober), Ward filed a petition for temporary custody of A.H. pursuant to AS 47.10.142(c). The superior court held a hearing on this petition the next day (April 8th). Neither Patricia Cornwall nor A.H. was present at this hearing, despite the State's efforts to notify them.[2]

On April 20, 1993, the superior court issued an order giving DFYS custody of A.H. for a period of 90 days. On May 10th, Grober appeared on behalf of Cornwall and moved to vacate the custody order. Superior Court Judge Mary E. Greene denied Cornwall's motion; Cornwall did not appeal this ruling. In two subsequent hearings (June 28 and July 29, 1993), Judge Greene extended DFYS's custody of A.H.

Although Cornwall was in hiding with her children, she kept in contact with Grober on a regular basis. Even after Judge Greene denied Cornwall's motion to vacate the custody order, Grober told Cornwall that "there [still] was a substantial legal question as to the effect of [the superior court's] order" because the State had never served a summons on Cornwall or on A.H.

In addition to the CINA proceedings, the State was pursuing its criminal prosecution of David Cornwall. In April, the State obtained a warrant for Patricia Cornwall's arrest as a material witness in that prosecution. In May, the State filed a complaint charging Patricia Cornwall with two felonies: AS 11.56.–510(a)(1) (interference with official

---

2. At approximately 6:40 p.m. on April 6, 1993, Patricia Cornwall telephoned Sonja Ward. Ward told Cornwall that the custody hearing was scheduled for April 8th, but she did not yet know the time. Cornwall asked Ward to leave the papers containing information about the hearing at the trooper station for Cornwall to pick up the next day. Ward agreed to leave the papers at the trooper station, and she also reminded Cornwall to keep her apprised of A.H.'s whereabouts at all times. The following day, Ward left the papers at the trooper station as Cornwall had requested, but Cornwall never picked up these papers. That same day, Ward and the troopers returned to the Cornwall residence with a search warrant, hoping to find A.H.. No one was home at the Cornwall residence, but Ward and the troopers found Ward's business card, which she had left with Cornwall on the afternoon of April 6th, torn into two pieces and thrown on top of the garbage. Ward left a note for Cornwall at the residence; this note contained the hearing time and a request for Cornwall to call her.

proceedings) and AS 11.56.540(a)(2) (witness tampering), and obtained another warrant for her arrest (this time, as a criminal defendant). Grober again appeared for Cornwall and moved to quash the arrest warrant; Superior Court Judge Richard Savell denied this motion. In late September, the authorities located Cornwall and A.H. in Michigan; they were brought back to Alaska.

Following her return to Alaska, Cornwall was indicted for interference with official proceedings (for using force on A.H. with the intention of influencing her testimony or with the intention of otherwise influencing the criminal proceedings against David Cornwall). Cornwall was also indicted for first-degree custodial interference (for withholding A.H. from the custody of the DFYS). Following a jury trial, Cornwall was convicted of both these charges, and she now appeals.

### Cornwall's Challenge to the Grand Jury Indictment

Before trial, Cornwall filed a motion asking the superior court to dismiss the count of the indictment charging Cornwall with custodial interference. Cornwall argued that the State never became a "custodian" of A.H., and therefore, even though Cornwall might have knowingly withheld A.H. from the authorities, she did not thereby commit the crime of custodial interference.

With regard to the period of April 6–8, 1993, Cornwall argued that the State was not a custodian of A.H. because (1) Sonja Ward, the social worker, never unequivocally exercised her authority to take A.H. into emergency custody, and (2) even if she did, such emergency custody is not the kind of "custody" that the custodial interference statutes are addressed to. Cornwall asserted that, before the State can become a "custodian" for purposes of the custodial interference statutes, there must be a court-ordered change in custody.

Cornwall recognized that, beginning on April 20, 1993, the superior court issued orders granting custody of A.H. to DFYS. However, Cornwall insisted that these court orders were not valid. She pointed out that, by the time the superior court held its first custody hearing on April 8th, Cornwall and A.H. had already left Fairbanks and neither Cornwall nor A.H. was ever served with a summons to attend these hearings. Cornwall argued that, without service of a summons, the superior court never obtained personal jurisdiction over either Cornwall or A.H., and thus the ensuing custody orders were void.

The superior court denied Cornwall's motion. On appeal, Cornwall again attacks the grand jury indictment, but the argument has shifted to different grounds.

In her opening brief, Cornwall focuses solely on the events of April 6, 1993. Cornwall renews her argument that DFYS's assertion of emergency custody was not "custody" for purposes of the custodial interference statute. Cornwall asks this court to declare that a social worker can not obtain custody of a child "simply by saying the magic words 'emergency custody' to a parent".[3] Cornwall's opening brief does not discuss the ensuing superior court orders giving custody of A.H. to DFYS.

In its responding brief, the State argues that the charge against Cornwall does not involve Sonja Ward's assertion of emergency custody over A.H. on April 6th. Cornwall was indicted for committing first-degree custodial interference during the months of June through September, 1993—in other words, long after the superior court had given custody to DFYS. (As explained above, the first superior court order giving custody to DFYS was issued on April 20, 1993.)

In her reply brief, Cornwall responds to the State's mootness argument with a variety of claims.

---

**3.** We note that, despite Cornwall's aspersion, the law gives legal effect to words in various circumstances. For instance, a police officer's words "You are under arrest" can convert a citizen's act of walking away into the crime of resisting arrest. Likewise, a property owner's words "I direct you to leave" can convert a citizen's presence on property into a trespass.

First, Cornwall asserts that, "as a matter of law, the state cannot become a "lawful custodian" until a court has *severed the relationship between parent and child* and has ordered that the state is *the* lawful custodian." (Emphasis added.) Cornwall appears to be arguing that the superior court has no power to place a minor in the custody of the Division of Family and Youth Services until the court has terminated the parental rights of the minor's parents or guardians.

Second, Cornwall argues that a superior court order entered under AS 47.10.142(e) (giving temporary custody of a minor to DFYS pending a full CINA hearing) does not establish "custody" for purposes of the custodial interference statute. Cornwall argues that only an order entered under AS 47.10.080(c)—that is, the judgement issued by the superior court when it makes its final CINA adjudication—is sufficient to vest DFYS with "legal custody" of a child.[4]

Third, Cornwall argues that even if a court order under AS 47.10.142 was sufficient to give custody of A.H. to the Division of Family and Youth Services, Cornwall was never properly served with the superior court's three custody orders. Cornwall asserts that she "could not be charged with custodial interference because she maintained her status as A.H.'s sole lawful custodian until a court order altered this relationship *and until she was served with notice that the court had done so"*. (Emphasis added.)

Fourth, Cornwall asserts that even if the law allows the State to prove that Cornwall obtained knowledge of the superior court's action through means other than personal service of the court's orders, the grand jury record nevertheless contains insufficient evidence that Cornwall was aware of the court's orders.

■ None of these arguments was preserved in the trial court.[5] These claims are therefore forfeited. *See* Alaska Criminal Rule 12(b)(1)–(2) and 12(e). To the extent that Cornwall might be relieved from this forfeiture by showing plain error, she has failed to do so.

Finally, Cornwall asserts that the prosecutor who presented the case to the grand jury erred by instructing the grand jury that, as a matter of law, the Division of Family and Youth Services became A.H.'s custodian on April 6, 1993. Before the grand jurors received this instruction, they heard Sonja Ward testify that she placed A.H. in emergency custody on that date. Thus, in context, the prosecutor was not telling the grand jurors what facts they must find; rather, the prosecutor's instruction was an explanation of the legal significance of Ward's actions— an explanation that, after a representative of DFYS has assumed emergency custody of a child, the state becomes a "lawful custodian" of the child for purposes of the custodial interference statute.

Cornwall's attack on the prosecutor's instruction appears to be a restatement of an argument that Cornwall did raise in the trial court: her assertion that "emergency custody" is not the type of custody addressed by the custodial interference statutes—that, for purposes of custodial interference, DFYS becomes a child's "lawful custodian" only after the superior court has issued an order ratifying DFYS's custody.

---

**4.** The Alaska Supreme Court apparently rejected this argument in *Matter of E.A.O.*, 816 P.2d 1352, 1355 (Alaska 1991): "Although [AS 47.10].084 on its face only applies to cases where children are committed to the department after a disposition hearing, the parties agree that its principles apply here, where the commitment was a result of a temporary placement hearing [under] AS 47.10.142(e)."

**5.** To reiterate, Cornwall argued below that the superior court's custody orders were invalid because Cornwall was never served with a summons to attend the proceedings, and thus the superior court never obtained personal jurisdiction over Cornwall. Cornwall has abandoned this argument. It also appears to be meritless. *See* Alaska Child in Need of Aid Rule 7(d) ("Inability to obtain service on any party does not deprive the court of jurisdiction."); *In re Interest of R.G.*, 238 Neb. 405, 470 N.W.2d 780, 790 (1991); *N.W. v. Madison County Department of Public Welfare*, 493 N.E.2d 1256, 1258–59 (Ind. App.1986).

This argument was preserved for appeal, but it is moot. As noted above, the period covered by the indictment is June through September, 1993. During this entire period, DFYS's custody of A.H. was premised on custody orders issued by the superior court. These orders were introduced at grand jury through the testimony of the clerk of court.

We therefore uphold the count of the grand jury indictment charging Cornwall with custodial interference. However, for reasons explained below, we hold that Cornwall is entitled to a new trial because she was prevented from presenting important testimony concerning an element of the crime of custodial interference.

### The Superior Court's Ruling on the Scope of Attorney Marc Grober's Testimony

At trial, Cornwall called her attorney, Marc Grober, to testify on her behalf. During voir dire examination outside the presence of the jury, Grober testified that he advised Cornwall on April 7, 1993, that Sonja Ward's assertion of emergency custody was invalid because Ward had neither taken physical custody of A.H. nor served Cornwall with any documents. After the superior court issued its orders granting custody of A.H. to DFYS, Grober (who remained in contact with Cornwall) continued to advise her that "there was a substantial legal question" as to the validity of the superior court's orders because Cornwall and A.H. had never been personally served with a summons to attend the court proceedings. Grober thus advised Cornwall that she remained free to take A.H. and go where she pleased, at least until she was served with court process.

The State objected to Grober's testimony, arguing that Cornwall was trying to establish that she acted under a mistake of law. The State argued that Cornwall could not avail herself of a mistake-of-law defense because Cornwall had not acted in good faith when she solicited Grober's advice; rather, the

State asserted, Cornwall had selectively revealed only the parts of her situation most favorable to herself, so that she could obtain the advice she wanted to hear.

Superior Court Judge Niesje J. Steinkruger agreed with the State that Cornwall was trying to raise a mistake-of-law defense, and she barred Cornwall from presenting this testimony:

> THE COURT: [E]vidence [has been offered] that the defendant was acting under a mistake of law—in other words, that she had received legal advice regarding the validity of the State's actions relating to emergency custody [and] the court's ... subsequent orders regarding custody, [and] how those affected her[.]

> . . . . .

> Mistake of law ... is an issue for the court, as clearly set forth in *Ostrosky [v. State]*, ... 704 P.2d 786 [ (Alaska App. 1985) ], with [a] subsequent opinion at 725 P.2d 1087 [ (Alaska App.1986)] ... The general rule is that mistake of law is no defense in Alaska.... Alaska has adopted a very limited defense of mistake of law[.] ... [T]he defendant must establish by a preponderance of the evidence that it was reasonable to rely on the mistake of law[.] [In] footnote 2 of *Ostrosky* [,] ... the Alaska Court of Appeals specifically declines to find that relying on the advice of an attorney constitutes mistake of law.

> . . . . .

> This court makes the following findings: [One], that the reliance by the defendant on the advice of counsel regarding the validity of the State's actions regarding taking emergency custody was unreasonable, either (a) because she failed to give complete information to her counsel from which he could give an opinion; or (b) because the opinion was inaccurate regarding the State's custody, because [the attorney] had insufficient facts. And two, relying upon counsel regarding the validity of ... the court's orders ... placing the child in the custody of the State ... was unreasonable in this circumstance. [Because Cornwall had] information from her counsel that those orders existed, the court

finds [that] any reliance is unreasonable and that the defendant has failed to establish a mistake of law defense by a preponderance of the evidence.

Based upon [this] ruling, the court finds that the legal opinions given by counsel regarding the effect of orders ... in the child-in-need-of-aid case ... [are] not relevant to this proceeding and will not be allowed [into evidence]. Certainly, the facts as to whether the defendant knew about certain court orders or knew about warrants or knew that her daughter ... could be a witness are relevant, and therefore the court will allow testimony within those parameters.

When Cornwall's attorney sought clarification of Judge Steinkruger's ruling, the judge stated that Grober would be allowed to testify that he told Cornwall of the existence of the superior court's orders, but Grober could "not testify that, in his opinion, those [orders] did not have legal effect on [Cornwall]". The following colloquy then ensued:

> DEFENSE ATTORNEY: Now, does your ruling mean that you are precluding Mr. Grober from informing the jury that he advised my client that she was free to do as she saw fit?
>
> THE COURT: Yes. Now I say "yes" because you've phrased that in a manner that I'm not sure what you mean. If his legal advice to her was based upon the information she had given him—the State didn't have emergency custody, and ... she was free to do whatever she wanted to do—I mean, an attorney can say, "Here's what I see, here's what I think the effect is; the decision is yours." If he was saying, "The decision is yours; you're free to do whatever you want," he can testify to that. [But if he was saying], "The State doesn't have custody; you're free to do whatever you want", then he's not—he may not testify regarding that. They're two different things.
>
> DEFENSE ATTORNEY: Okay.

Thus, Judge Steinkruger prohibited Grober from testifying about his legal analysis of the superior court's custody orders. Under Judge Steinkruger's ruling, Grober was free to testify that he informed Cornwall of the superior court's orders giving custody of A.H. to the Division of Family and Youth Services, but Grober was precluded from testifying that he told Cornwall there was a substantial doubt as to the validity of those orders. In effect, the court's ruling allowed Grober to testify concerning the inculpatory aspects of his conversations with Cornwall, but it barred Grober from testifying about the exculpatory aspects of those same conversations.

### (a) Cornwall's Conviction for Custodial Interference Must Be Reversed

■ Normally, attorneys are not allowed to testify concerning their legal analysis of the matters being litigated. This is because, in a jury trial, issues of law are decided by the judge, not the jury. It is the jury's role to decide the facts of the case, but it is the judge's role to instruct the jury on the legal significance of the facts. Therefore, when lawyers disagree concerning the law that governs a case, they offer arguments to the trial judge, not testimony to the jury.

If Grober's testimony had been offered for the purpose of convincing the jury that the superior court's 1993 custody orders had no legal effect on Cornwall (or, more precisely, that there was a substantial possibility that these orders had no legal effect on Cornwall), Grober's testimony would clearly have been inadmissible. The legal effect of the superior court's custody orders was an issue of law to be decided by the trial judge.

■ Similarly, if Grober's testimony had been offered to support a "mistake of law" defense, then his testimony should not have been heard by the jury. A mistake-of-law defense is decided by the trial judge. *Clark v. State*, 739 P.2d 777, 779 n. 1 (Alaska App.1987); *Ostrosky v. State*, 704 P.2d 786, 792 (Alaska App.1985), *appeal after remand*, 725 P.2d 1087, 1090 (Alaska App.1986) (*Ostrosky II* ).

However, Grober's testimony was not offered to support a mistake-of-law defense. Instead, Grober's testimony was offered because it was relevant to the issue of whether Cornwall had the culpable mental state required for custodial interference. Grober

testified that he analyzed the legal effect of the superior court's custody orders and then communicated his analysis to Cornwall. Whether or not Grober's legal analysis of the superior court's orders was sound, the fact that he communicated that analysis to Cornwall was relevant to the jury's task of ascertaining Cornwall's state of mind when she performed the acts alleged in the indictment.

As we explained in *Strother v. State*, 891 P.2d 214, 223 (Alaska App.1995), the crime of custodial interference has three main elements. The actus reus of the offense (the physical conduct prohibited by the statute) is the act of taking or keeping a child from a lawful custodian. In addition to this physical conduct, the government must prove that the defendant acted with two culpable mental states. First, the defendant must have known that he or she had no legal right to take or keep the child from the custodian. Second, the defendant must have intended to hold the child for a protracted period of time. (The meaning of knowledge and intent for these purposes is found in AS 11.81.900(a)(1)–(2).)

Grober's testimony was relevant to the first of these culpable mental states—Cornwall's knowledge that she had no legal right to take or keep A.H. from the Division of Family and Youth Services. Under AS 11.81.900(a)(2), "when knowledge of the existence of a particular fact"—here, the fact that Cornwall had no legal right to keep A.H.

from DFYS—"is an element of an offense, that knowledge is established if [the defendant] is aware of a substantial probability of its existence, unless [the defendant] actually believes that it does not exist". Thus, if Cornwall honestly believed (even mistakenly) that there was no legal impediment to her taking A.H. and hiding A.H. from the authorities, then Cornwall did not act with the culpable mental state required for the crime of custodial interference.

It may seem that we are allowing Cornwall to present a "mistake of law" defense to the jury, but that is not the case. Normally, criminal statutes do not require proof that the defendant acted with awareness of the applicable law. Thus, a defendant's awareness or ignorance of the governing law normally has no relevance to the proof or disproof of the elements of the offense. However, the legislature may define a crime to require proof that the defendant acted with awareness of the law. As stated in AS 11.81.620(a),

> Knowledge ... as to whether conduct constitutes an offense, or knowledge ... as to the existence, meaning, or application of the provision of law defining an offense, is not an element of an offense *unless the provision of law clearly so provides*.

(Emphasis added.) [6]

The legislature has defined custodial interference to require proof that the de-

---

**6.** *See* Wayne R. LaFave and Austin W. Scott, Jr., *Substantive Criminal Law* (1986), §§ 5.1(a) & 5.1(d), Vol. 1, pp. 575–77 and 585–89, as supplemented in the 1996 pocket part, pp. 58–59:

> The basic rule is ...: ignorance or mistake of fact or law is a defense when it negatives the existence of a mental state essential to the crime charged.... For example, to take the classic case of a man who takes another's umbrella out of a restaurant because he mistakenly believes that the umbrella is his, ... the man is not guilty because he does not have the mental state (intent to steal the property of another) required for the crime of larceny.... If, instead of [mistaking one umbrella for another], the [defendant] took the [umbrella] through a mistake of law, such as that his prior dealings had vested ownership of [the umbrella] in him, he would again not have the intent-to-steal mental state required for the crime of larceny.
>
> Ignorance of the law ... *is* an excuse when it negatives a required mental state[.] ... Il-

> lustrative [of this concept] is a statute making it an offense knowingly to evade the payment of income taxes, properly interpreted in *Cheek v. United States* [, 498 U.S. 192, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991),] as not reaching a defendant who was unaware of his duty under the law to pay taxes. As the Supreme Court explained, the "proliferation of statutes and regulations has sometimes made it difficult for the average person to know and comprehend the extent of the duties and obligations imposed by the tax laws," and accordingly the Congress made "intent to violate the law an element of certain federal criminal tax offenses." [82.4]
>
> [82.4] [However,] the Court concluded that the knowledge-of-duty element was not defeated if the defendant knew of the law but

fendant acted with knowledge that he or she had "no legal right" to take or keep the child from the specified lawful custodian. Cornwall's subjective understanding of the legal effect of the superior court's custody orders was directly relevant to the proof or disproof of this element. And Cornwall's conversations with Grober were directly relevant to the task of ascertaining Cornwall's subjective understanding. We thus conclude that Grober should have been allowed to testify concerning what he told Cornwall about the legal effect of the superior court's custody orders.

The State argues that the error in excluding Grober's testimony was harmless because, when Grober's answers on voir dire testimony are carefully examined, they appear to be more favorable to the State than to Cornwall. But taking Grober's evidence in the light most favorable to Cornwall, there is a substantial possibility that the error in excluding Grober's testimony appreciably affected the jury's verdict on the custodial interference charge. *Love v. State*, 457 P.2d 622, 629–631 (Alaska 1969). For this reason, Cornwall's custodial interference conviction must be reversed.[7]

#### (b) *Did this Error Affect Cornwall's Conviction for Interference with Official Proceedings?*

In a related argument, Cornwall asserts that her conviction for interference with official proceedings must also be reversed because of the error in excluding Grober's testimony. Cornwall argues that Grober's testimony was relevant to the interference with official proceedings charge because Grober's testimony tended to establish Cornwall's belief concerning whether she was A.H.'s lawful custodian. As explained

above, we agree that Grober's testimony was relevant to the issue of Cornwall's subjective belief concerning her legal status. The question remains, however, whether Cornwall's subjective belief concerning her legal status was relevant to the interference with official proceedings charge.

In Count I of the indictment (the count charging interference with official proceedings), Cornwall was charged with using force upon A.H. (that is, forcibly removing A.H. from the Fairbanks area) for the purpose of influencing the outcome of the criminal prosecution against her husband, David Cornwall. Defending herself against this charge, Cornwall asserted that her act of removing A.H. from Fairbanks had been motivated by her belief that A.H. needed to be moved elsewhere to obtain counseling for the sexual abuse she had suffered. *See* AS 11.81.430(a)(1), as interpreted in *State v. Jones*, 750 P.2d 828 (Alaska App.1988).

The jury at Cornwall's trial received an instruction embodying this defense:

Count I [of the indictment] charges the defendant with Interference with Official Proceedings[.] [A]n element of [this] offense is that the defendant used force on A.H. The use of force upon another person that would otherwise constitute an offense is justified under the following circumstance: when and to the extent reasonably necessary and appropriate to promote the welfare of a child[,] a parent, who is the lawful custodian of that child, may use reasonable and appropriate nondeadly force upon that child. It is for you to determine whether a decision by the defendant to remove A.H. from the jurisdiction was not in fact made to promote the welfare of A.H. or

believed, even reasonably, that it was unconstitutional as applied to him. In such circumstances, [the Court held,] Congress anticipated that the person should pay the tax and then ... challenge the constitutionality of the tax[.]

(Emphasis in the original; footnotes omitted, with the exception of footnote 82.4.)

7. If Cornwall is retried, the reception of Grober's testimony may require some care. For instance, when the jury determines whether DFYS became

a lawful custodian of A.H. by virtue of either Sonja Ward's actions on April 6th or the superior court's subsequent custody orders, the jury will be bound by the trial judge's instruction(s) on the legal effect of those actions and orders. The jury can properly be instructed that, on this issue, they should disregard anything that Grober might say to the contrary. However, the jury should consider Grober's statements to Cornwall when the jury decides the issue of whether Cornwall knew that she had no legal right to keep A.H. from DFYS.

was not reasonably necessary and appropriate to promote the child's welfare.... [U]nless the state has proven beyond a reasonable doubt that the defendant did not act in these circumstances, you should find the defendant not guilty.[8]

Under this instruction, the availability of the "parental justification" defense hinged on two major issues: (1) whether Cornwall was A.H.'s "lawful custodian" at the time she removed A.H. from Fairbanks and, later, from the State of Alaska; and (2) whether Cornwall's acts of taking and hiding A.H. were "reasonably necessary and appropriate to promote [A.H.'s] welfare".

Cornwall's jury was instructed that "lawful custodian" meant "a parent, guardian, or other person responsible by authority of law for the care, custody, or control of another". Using this instruction as a point of departure, the parties litigated Cornwall's status as an issue of fact. The prosecutor argued to the jury that, because of Sonja Ward's actions and the superior court's ensuing custody orders, Cornwall was not A.H.'s lawful custodian during the time period covered by the indictment. Cornwall's attorney argued that, because Cornwall was A.H.'s mother and because DFYS had left the child in her physical custody, Cornwall remained A.H.'s lawful custodian.

Cornwall's attorney further argued that Cornwall's actions had been motivated by an intent to protect A.H. and to secure her welfare. The defense attorney reminded the jury that a mental health clinician, Jana Eyer–Stough, had testified that it was difficult to say whether a sexual abuse victim was hurt more by the sexual abuse or by going

through the ensuing judicial process. The prosecutor responded that Cornwall's intention was irrelevant: to claim the "parental justification" defense, Cornwall had to be a lawful custodian, and she was not.

The jury's general verdict does not allow us to ascertain whether the jury rejected Cornwall's parental justification defense because they concluded beyond a reasonable doubt that Cornwall was not A.H.'s lawful custodian or, alternatively, because they concluded beyond a reasonable doubt that Cornwall's actions were not "reasonably necessary and appropriate to promote the child's welfare".[9]

Against this background, we now evaluate Cornwall's assertion that Marc Grober's testimony was relevant to her "parental justification" defense. As explained above, the parental justification defense raised two main issues: whether Cornwall was A.H.'s lawful custodian, and whether Cornwall's conduct was reasonably necessary and appropriate to promote A.H.'s welfare.

■ With regard to the first of these issues (whether Cornwall was A.H.'s lawful custodian), the question for the jury was whether Cornwall was *in fact* A.H.'s lawful custodian, not whether she believed herself to be. The parental justification defense codified in AS 11.81.430(a)(1) is not defined in terms of the defendant's knowledge of or belief concerning her legal status. Under the statute, the defense is available only to people who are in fact lawful custodians of children. If the jury found that Cornwall was not A.H.'s lawful custodian, then it would be irrelevant that Cornwall mistakenly be-

---

8. By quoting this instruction, we do not intend to give it our judicial imprimatur. This instruction uses the phrase "lawful custodian of [a] child", even though the underlying statute, AS 11.81.430(a)(1), uses words that suggest a broader application: "parent, guardian, or other person entrusted with the care and supervision of a child". Further, because the instruction refers to a person "who is *the* lawful custodian" of a child (emphasis added), the instruction might be read to require the jury to identify a single person or entity as the sole lawful custodian of a particular child. In fact, a child may have more than one lawful custodian. *See Strother v. State*, 891 P.2d 214, 223–24, 226 (Alaska App.1995).

9. In addition to arguing a "parental justification" defense to the jury, Cornwall litigated an ancillary "mistake of law" claim to Judge Steinkruger. Cornwall argued that, even if she was no longer A.H.'s lawful custodian when she fled with A.H., she nevertheless acted under a good-faith, mistaken belief (based on Marc Grober's advice) that she remained A.H.'s lawful custodian. As described above, Judge Steinkruger heard Grober's testimony and rejected Cornwall's mistake-of-law defense. The judge concluded that, to the extent Cornwall might have relied on Grober's advice in deciding that the superior court's custody orders were invalid, Cornwall acted unreasonably.

lieved herself to be A.H.'s lawful custodian. Grober's testimony therefore had no direct bearing on the first issue raised by Cornwall's parental-justification defense—whether Cornwall was in fact A.H.'s lawful custodian. Judge Steinkruger could properly exclude Grober's testimony on this point.

Similarly, Grober's testimony seemingly has no direct bearing on the second issue raised by Cornwall's parental-justification defense—whether Cornwall's actions were reasonably necessary and appropriate to promote A.H.'s welfare. Under the statutory definition of the parental-justification defense, the test of reasonable necessity is an objective one: the jury was called upon to decide, not whether Cornwall subjectively believed her actions to be necessary and appropriate, but rather whether Cornwall's actions were in fact reasonably necessary and appropriate. It is unclear to us how Grober's testimony, which was offered only to establish Cornwall's subjective belief as to her lawful custody of A.H., could have influenced the jury's determination of whether, objectively viewed, Cornwall's actions were reasonably necessary and appropriate to promote the welfare of A.H.

█ It appears, therefore, that the error in excluding Grober's testimony affected only the custodial interference charge and that it did not affect the jury's ability to reach a fair decision on the interference with official proceedings charge. Nevertheless, we note that the issue of harmless error as to the interference with official proceedings charge has received only token briefing by the parties.[10] We are concerned that our view of this issue may be clouded by the lack of meaningful discussion in the parties' briefs. Despite our present inability to see how the erroneous exclusion of Grober's testimony had any impact on the jury's consideration of the interference with official proceedings charge, we think it possible that the lack of full adversarial briefing may mask potential prejudice to Cornwall's case. We conclude that the interests of justice will be served by allowing the parties to file supplemental briefing before we decide whether this error was harmless. We thus reserve decision on this point.

*The Superior Court's Refusal to Give Cornwall's Proposed Instruction on Emergency Custody*

On the first day of Cornwall's trial, Judge Steinkruger recognized that there might be both factual and legal disputes as to whether Sonja Ward asserted emergency custody over A.H. on April 6, 1993. As to potential legal questions, the judge declared that "the Court has not been asked to rule [on the emergency custody issue] as a matter of law". She encouraged the attorneys to think about this issue.

On the second day of trial, Cornwall's attorney submitted a proposed jury instruction on the question of whether the Division of Family and Youth Services took emergency custody of A.H. on April 6, 1993. This instruction read:

In order for you to find that Pat Cornwall is guilty of the crime of Custodial Interference in the first degree, you must find that the State of Alaska through the Department of Health and Social Services had taken EMERGENCY CUSTODY of

---

10. In her opening brief, Cornwall evidently assumed that the error in excluding Grober's testimony affected both charges. In a few conclusory sentences, Cornwall argued that because Grober's testimony revealed her subjective understanding of her status as A.H.'s custodian, this testimony was relevant to the interference with official proceedings charge.

Responding to Cornwall's opening brief, the State made two arguments. The State first argued that Cornwall had abandoned this issue by failing to adequately brief it. Cornwall's discussion of this issue is admittedly sketchy. However, given the difficult nature of the legal issues involved in Cornwall's case, and given Cornwall's misunderstanding of the elements of her parental-justification defense, we are reluctant to find that Cornwall abandoned her argument regarding the harmfulness of the error. The State argued alternatively that any error in excluding Grober's testimony had no impact on the interference with official proceedings charge. However, this argument was presented in conclusory terms.

In her reply brief, Cornwall again chose to give the harmless-error issue only a passing nod, setting out a cursory argument that the error might somehow have affected the jury's consideration of the first prong of the parental-justification defense (whether Cornwall was A.H.'s legal custodian). As we have explained, however, this argument is incorrect.

[A.H.] on April 6, 1993. In order for the Department to have taken emergency custody you must find:

> 1. that the Department took physical possession and control of [A.H.] on the afternoon of April 6.

> 2. that the Department notified Pat Cornwall as soon as possible, but in any event within 12 hours unless unable to reach her, that they had taken the physical possession and control of [A.H.]; and

> 3. that the Department notified the court of the emergency custody by filing, within 12 hours after custody was assumed, a petition alleging that [A.H.] was a child in need of aid.

If you find that the Department did not take each and every one of these steps, you must find the Defendant not guilty of the crime of Custodial Interference in the first degree.

.　　.　　.　　.　　.

As can be seen, Cornwall's proposed instruction embodied the legal assertion that, unless a DFYS representative takes physical possession of a child, any purported assertion of emergency custody has no legal effect. It was undisputed that Sonja Ward (the DFYS representative) did not take physical possession of A.H. on April 6. Thus, under Cornwall's instruction, the jury would be directed to acquit Cornwall of custodial interference.

When Cornwall's attorney submitted this instruction, he made no argument in support of the instruction, and he provided the court with no supporting legal authority. At the beginning of the next day's proceedings, Judge Steinkruger again reminded the parties that, potentially, there could be both factual and legal disputes concerning DFYS's assertion of emergency custody. She told the parties that any factual dispute would be submitted to the jury, but questions of law would be decided by the court, not the jury. Cornwall's attorney was therefore on notice that, to the extent the proposed instruction on emergency custody incorporated disputed legal theories or definitions, those legal issues would have to be litigated to Judge Steinkruger.

Subsequently, during the defense attorney's cross-examination of a government witness, the question arose whether DFYS's failure to file a petition with the superior court within 12 hours of assuming emergency custody of A.H. might invalidate the emergency custody and thus constitute a defense to the charge of custodial interference. Judge Steinkruger ruled that DFYS's failure to meet the 12-hour time limit was not a defense. This ruling was, in effect, a rejection of paragraph 3 of Cornwall's proposed instruction. Despite this, Cornwall's attorney accepted Judge Steinkruger's ruling without presenting any counter-argument.

Just before final arguments, Judge Steinkruger distributed copies of the court's packet of proposed jury instructions. This packet did not include an instruction on the definition of "emergency custody". Cornwall's attorney did not object to this omission. Instead, the following colloquy took place between Cornwall's attorney and Judge Steinkruger:

> DEFENSE ATTORNEY: I take it [that] the absence of an instruction defining "emergency custody" means we're free to argue our theory of what is emergency custody?

> THE COURT: What I said originally—[when] no one had proposed an instruction on emergency custody—was that ... I urged you to look at [this issue] in the event that the jury came back with a question about emergency custody. And so I didn't put [your proposed instruction] in.

> DEFENSE ATTORNEY: Okay.

> THE COURT: My goal was to ... alert you to the possibility that [this issue] seemed to me an area that could come up. The reason I didn't put [your proposed instruction] in is that the [time] period [charged in Count II] is June to September[;] the charged period is not April 6th.

.　　.　　.　　.　　.

> DEFENSE ATTORNEY: Okay.

On appeal, Cornwall asserts that Judge Steinkruger committed error by declining to give Cornwall's proposed instruction on emergency custody. She claims that "[t]he court provided no explanation for refusing to

give" the proposed instruction. But, as can be seen from the above-quoted exchange, Judge Steinkruger did explain why she was not instructing the jury on the legal definition of emergency custody. The judge told the parties that no instruction was necessary because Count II of the indictment (the count charging custodial interference) covered June through September 1993—a period of time in which A.H.'s custody was governed, not by emergency custody, but by superior court order.

 Cornwall's trial attorney accepted this explanation without comment and voiced no objection to Judge Steinkruger's decision to omit the proposed instruction. Thus, Cornwall failed to preserve an objection to the superior court's decision. *See* Alaska Criminal Rule 30(a).[11]

 Moreover, as we have already discussed in the context of Cornwall's attack on the indictment, Cornwall has failed to demonstrate that the superior court's omission of this instruction was plain error. Judge Steinkruger ruled that, because the period covered in the indictment was June through September, the validity of the initial emergency custody was a moot issue. Judge Steinkruger's ruling is supported by the Alaska Supreme Court's decision in *R.C. v. Alaska Department of Health & Social Services*, 760 P.2d 501 (Alaska 1988). In *R.C.*, a parent challenged the procedures employed at a temporary custody hearing. The supreme court held that, because DFYS's custody of the child was re-affirmed in later judicial proceedings that were not challenged, the purported defects in the temporary custody hearing were not plain error:

> [E]ven if procedural defects existed in an earlier temporary custody hearing, they can be cured by a subsequent procedurally correct final dispositional hearing. *D.E.D. v. State*, 704 P.2d 774, 782 (Alaska 1985). Because the parents [in this case] subsequently acknowledged ... that their children were in fact in need of aid and that the Department should have custody of them, any alleged defects in the first temporary custody hearing were not "obviously prejudicial" to the point of plain error.

*R.C.*, 760 P.2d at 507. By analogy, purported defects in DFYS's assertion of emergency custody of A.H. would be mooted by later judicial proceedings under AS 47.10.142(d)–(e) in which the superior court gave temporary custody of A.H. to DFYS. We find no plain error.

*Conclusion*

We uphold Cornwall's indictment, and we uphold the superior court's refusal to give Cornwall's proposed instruction defining "emergency custody". However, due to the exclusion of Marc Grober's testimony, Cornwall's conviction for custodial interference is REVERSED. Cornwall is entitled to a new trial on that charge.

Regarding Cornwall's conviction for interference with official proceedings, we reserve decision and direct the parties to file supplemental briefs on two issues:

> With regard to jury instructions, Alaska Criminal Rule 30(a) declares, in pertinent part, "No party may assign as error any portion of the charge [to the jury] or omission therefrom unless the party objects thereto before the jury retires to consider its verdict, *stating distinctly the matter to which the party objects and the grounds of the objections.*" (Emphasis added). Cornwall's proposed jury instruction on emergency custody incorporated questionable propositions of law, yet the defense attorney failed to provide any legal authority in support of the instruction. Moreover, when Judge Steinkruger explained why she believed that the issues addressed in Cornwall's proposed instruction were moot, the defense attorney accepted Judge Steinkruger's explanation without comment. By failing to comply with the requirements of Criminal Rule 30(a), Cornwall failed to preserve her arguments for appeal.

---

11. We note that Judge Steinkruger told the parties that if they submitted any proposed instructions different from the ones ultimately given by the court, those proposed instructions would be considered "objections" to the court's instructions. However, Judge Steinkruger did not have the authority to excuse the parties from their normal burden of preserving a point for appeal. When a party objects to a trial judge's ruling but fails to present any argument or legal authority in support of his or her position, that point is not preserved. *See Hohman v. State*, 669 P.2d 1316, 1325–26 (Alaska App.1983) (when a party offers evidence which is challenged for lack of relevance, and the offering party fails to make an offer of proof concerning the potential relevance of challenged testimony, the party has thereby failed to preserve the point for appeal).

(1) Was Marc Grober's testimony relevant to the determination of whether Cornwall's actions were reasonably necessary and appropriate to promote A.H.'s welfare? And, if so,

(2) Did the exclusion of this testimony have an appreciable effect on the jury's verdict?

Cornwall's supplemental brief shall be filed within 30 days of the issuance of this opinion. The State's brief shall be filed within 20 days of the filing of Cornwall's brief.

We retain jurisdiction over this case.