Thomas BUSBY, Appellant,

v.

STATE of Alaska, Appellee.

No. A–7527.

Court of Appeals of Alaska.

Feb. 1, 2002.

Laurel Carter, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

Rachel K. Gernat, Assistant District Attorney, Roman J. Kalytiak, District Attorney, Palmer, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

MANNHEIMER, Judge.

Thomas Busby is a former Alaska resident whose driver's license was revoked while he was living here. Busby later moved to Nicaragua, where he obtained an international driving permit under the provisions of the United Nations Convention on Road Traffic.

The United Nations Convention on Road Traffic is a multi-national treaty governing non-commercial international vehicular traffic. In Chapter V of this treaty, the signatory countries agree to grant reciprocal recognition to driver's licenses issued by the other signatory countries—although the countries can require that foreign drivers obtain and carry an "international driving permit" that is organized and printed in conformity to a model prescribed in an appendix to the Convention. Busby obtained such a permit while living in Nicaragua.

In 1998, Busby drove from Central America to Alaska. On October 28th, a state trooper stopped him outside of Talkeetna for a traffic violation. During the stop, the trooper discovered that Busby's Alaska driver's license was revoked, so Busby was charged with (and subsequently convicted of) the misdemeanor of driving while his license was revoked, AS 28.15.291(a).

Busby asserts that even though his Alaska driver's license was revoked, he was still entitled to drive in Alaska because he had the international driving permit. But as we explain in more detail below, the Convention on Road Traffic does not preclude the State of Alaska from enforcing license revocations imposed under Alaska law. Signatory countries retain the authority to enforce their traffic laws, to take action against the licenses of motorists who violate those laws, and to forbid a motorist from driving within their territory if the motorist's privilege to drive has been suspended or revoked.

The Convention does forbid a signatory country (or subsidiary state) from imposing or enforcing license revocations in a manner that discriminates against residents of other signatory countries. But Busby does not claim that he was the victim of such discrimination. Busby's license was revoked for conduct that would have led to license revocation if committed by an Alaska resident. (Indeed, Busby's license was revoked while he was an Alaska resident.) And Busby does not claim that he was singled out for prosecution because he was a resident of a foreign country—*i.e.*, that the State would not have charged him with the offense of driving with a revoked license if he had still been an Alaska resident.

For these reasons, we uphold the State of Alaska's authority to prosecute Busby for driving while his license was revoked.

*General description of the 1949 United Nations Convention on Road Traffic*

To "promot[e] the development and safety of international road traffic", the United Nations drafted a Convention on Road Traffic to regulate non-commercial vehicular traffic moving between countries.[1] (In this opinion, certain pertinent provisions of the Convention are quoted *verbatim*. The full text of the Convention is found in *United States Treaties and Other International Agreements*, Vol. 3, Part 3, pp. 3010–3021.)

██ The United States has signed the Convention on Road Traffic. The Convention is therefore part of our federal law, and the provisions of the Convention supersede any contrary state law.[2]

According to Article 1, Section 1 of the Convention, each signatory country "reserv[es] its jurisdiction over the use of its own roads" but "agrees to the use of its roads ... under the conditions set out in [the] Convention". The Convention governs several aspects of international vehicular travel, from road signs to license plates to red reflectors on the back of cycles.[3] Bus-

---

**1.** By its terms, the Convention does not apply to "the carriage of persons for hire or reward or the carriage of goods other than the personal baggage of the occupants of the vehicle". (Article 5) Nor does the Convention bind a signatory country when "[a] motor vehicle [or] driver ha[s] remained within its territory for a continuous period exceeding one year". (Article 1, Section 2)

**2.** Article VI of the United States Constitution declares that "all Treaties made ... under the Authority of the United States ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." Thus, "the treaty-making power [of the federal government] is independent of and superior to the legislative power of the states". *Nielsen v. Johnson*, 279

U.S. 47, 52, 49 S.Ct. 223, 224, 73 L.Ed. 607 (1929).

**3.** Chapter II of the Convention (Articles 6 through 16) dictates certain basic "rules of the road". For example, Article 10 requires drivers to "drive in a reasonable and prudent manner" and to "slow down or stop whenever circumstances so require". Chapter III (Article 17) governs road signs. Chapter IV (Articles 18 through 23) governs license plates, vehicle registration, and vehicle size; it also requires vehicles to "be in good working order and in such safe mechanical condition as not to endanger the driver, other occupants of the vehicle[,] or any person upon the road, or cause damage to public or private property". (Article 22, Section 1) Chapter VI (Article 26) governs cycles: it requires them to have "[a]t least one efficient brake", "[a]n audible warning device", as well as

by's case requires us to construe Chapter V of the Convention (Articles 24 and 25), the chapter dealing with international driving permits. The particular point of contention is the proper interpretation of Article 24, Section 5.

*The dispute concerning the meaning of Article 24, Section 5*

■ Article 24, Section 1 requires each signatory country to recognize the driver's licenses issued by other signatory countries. Section 1 declares that if a driver "holds a valid driving permit issued ... by the competent authority of another [signatory] State or subdivision thereof", each signatory country

> ... shall allow [the] driver ... to drive on its roads[,] without further examination[, all] motor vehicles of the category or categories ... for which the permit has been issued.

This obligation is modified slightly by Section 2, which allows signatory states to require drivers licensed in other countries to "carry an international driving permit conforming to the model [set forth] in [A]nnex 10" to the Convention. But Section 3 requires signatory states to issue international driving permits to all drivers who apply for them (assuming the driver demonstrates the required driving competency).

As noted above, Busby received an international driving permit from the government of Nicaragua, and this permit was in force when Busby was stopped in Alaska and charged with driving with a revoked license. Busby contends that the State of Alaska was obliged to honor his international driving permit even though his Alaska driver's license was revoked.

Busby's argument appears to falter on Article 24, Section 5 of the Convention on Road Traffic. This provision gives each signatory country (and its political subdivisions, such as the State of Alaska) a limited power to withdraw a driver's right to use an international driving permit on its roads. Article 24, Section 5 declares:

> "[a] white or yellow light in front" and "a red light or red ... reflector in the rear ... during

> A [signatory] State or a subdivision thereof may withdraw from the driver the right to use either [an international driving permit or a driving permit issued directly by another signatory country] only if the driver has committed a driving offence [*sic:* the Convention uses the British spelling] of such a nature as would entail the forfeiture of his driving permit under the legislation and regulations of that [signatory] State....

That is, each country has the authority to refuse to honor an international driving permit if the permit-holder has committed an offense that would entail the loss of driving privileges if committed by a resident of that country. Section 5 then continues:

> [When the holder of an international driving permit has committed a driving offense of this nature], the [signatory] State or subdivision thereof withdrawing the use of the permit may withdraw and retain the permit until the period of the withdrawal of use expires or until the [permit-]holder leaves the territory of the [signatory] State, whichever is the earlier....

In other words, a signatory country (or a political subdivision within that country) has the authority to "withdraw and retain" a person's international driving permit until the period of license suspension or revocation imposed by that country or political subdivision expires, or until the person leaves the territory of that country or political subdivision.

Busby's Alaska license was revoked while he was a resident of Alaska—before he moved to a foreign country, and before he was issued his international driving permit. Thus, it is clear that the State of Alaska revoked Busby's Alaska license for an offense that carried the penalty of license revocation if committed by a resident of this state. For this reason, it appears that the State of Alaska was authorized (under Article 24, Section 5 of the Convention) to withdraw Busby's right to use his international driving permit within this state.

Busby acknowledges this provision of the Convention, but he nevertheless argues that

> the night or when atmospheric conditions render it necessary".

his international driving permit remained valid. First, Busby claims that Article 24, Section 5 does not authorize a signatory country to withdraw a person's right to use an international driving permit unless the person commits a new driving offense—*i.e.*, commits an offense after the issuance of the international driving permit. In the alternative, Busby claims that even if a person's right to use an international driving permit can be withdrawn based on a pre-existing traffic offense, his permit remained in force because neither the United States nor the State of Alaska ever instituted official action to withdraw his right to use the permit—*i.e.*, never initiated a judicial or administrative proceeding to revoke and seize Busby's international driving permit (prior to his arrest for driving with a revoked license). Busby argues that because the government took no affirmative action against his international driving permit, the permit remained valid and gave him the right to drive in the State of Alaska despite his earlier license revocation.

*Busby's argument that a signatory country may not withdraw a person's right to use its roads based on a license suspension or revocation that pre-dates the issuance of the person's international driving permit*

As explained above, the first sentence of Article 24, Section 5 authorizes a signatory country to withdraw a person's right to drive within its territory if that person "has committed a driving offence of such a nature as would entail the forfeiture of [the person's] driving permit under the legislation and regulations of that [country]". Busby asserts that this provision does not allow the State of Alaska to *prospectively* prohibit him from using his international driving permit in this state. That is, Busby argues that even though his Alaska driver's license had already been (and still was) revoked at the time he obtained his international driving permit in Nicaragua, that permit nevertheless authorized him to drive on the roads of Alaska.

It is hard to decipher Busby's precise argument. He may be contending that the authority granted by Article 24, Section 5 applies solely to driving offenses committed *after* the person has been issued an international driving permit—that once he obtained an international driving permit, the Convention on Road Traffic guaranteed him the right to use his international driving permit within the boundaries of Alaska until such time as he committed a new driving offense (and the State of Alaska or the federal government initiated some new judicial or administrative proceeding to withdraw his right to drive). We address this argument in this section of our opinion.

Alternatively, Busby may be arguing that even though his prior license revocation was a sufficient reason for the State of Alaska to withdraw his right to use his international driving permit, the State never initiated a judicial or administrative proceeding for that purpose. Under this suggested interpretation of Article 24, Section 5, a signatory country can not prohibit a driver whose license has been revoked from leaving that country, obtaining an international driving permit from the government of another country, and then returning as a licensed driver— at least until the revoking country realizes what has happened and takes official action against the newly-issued international driving permit. We address this argument in the next section of our opinion.

Returning to Busby's argument that the Convention bars a signatory country from withdrawing a person's right to use an international driving permit on its roads unless the person commits a new driving offense, this contention almost rebuts itself. This interpretation of the Convention defies common sense. Busby offers no reason to believe that the countries who signed the Convention intended to give each other the authority to forgive or erase existing driver's license revocations imposed by their fellow treaty states. In fact, the Convention on Road Traffic suggests precisely the opposite.

Article 5 of the Convention declares that it is "understood that ... all ... matters not provided for in this Convention remain within the competence of [each signatory state's] domestic legislation". No provision of the Convention expressly limits a signatory coun-

try's ability to enforce its pre-existing driver's license suspensions and revocations within its own territory. Moreover, AS 28.40.100(8)—part of the "domestic legislation" of Alaska—declares that the term "driver's license" means "[a person's] privilege to drive or obtain a license to drive … *whether or not [the] person holds a valid license issued in this or another jurisdiction*". (Emphasis added) Thus, under Alaska law, revocation of a person's driver's license ends that person's privilege to drive, regardless of any other driver's licenses that the person may possess or (as in Busby's case) may come to possess.

Additionally, we note that Article 24 of the Convention on Road Traffic appears to be premised on the idea that each signatory country is authorized to enforce its own driver's license suspensions and revocations within its own territory, even though the driver has an international driving permit and is authorized to drive in other signatory countries. Article 24, Section 5 empowers each signatory country to seize a person's international driving permit if that person has committed a traffic offense that entails the loss of their driving privileges. The second sentence of Section 5 states that the signatory country can seize and keep the international driving permit, but only until the person leaves that country's territory. Requiring the country to return the international driving permit to the departing driver makes sense only if one supposes that the permit remains in force within other signatory countries (at least until such time as those countries take action against the person's driving privilege). This, in turn, implies that each country remains free to enforce its own license suspensions and revocations.

In *People v. Platts,* 274 Ill.App.3d 753, 211 Ill.Dec. 397, 655 N.E.2d 300 (1995), the Illinois Court of Appeals reached exactly this conclusion. *Platts* involved a driver whose Illinois license had been revoked. Platts moved to Canada, obtained a Canadian driver's license, and then returned to Illinois— where he was stopped for drunk driving and

also charged with driving while his license was revoked.[4] Platts argued that, under the provisions of the Convention on Road Traffic, "[his] Illinois revocation was terminated when he was issued a Canadian driver's license".[5] The Illinois court rejected this argument, interpreting the Convention as we have done here: Platts's Canadian license, while valid in Canada and perhaps other places, did not supersede the State of Illinois's pre-existing revocation of Platts's driving privileges within that state.[6]

We hold that the Convention on Road Traffic does not preclude the State of Alaska from enforcing Busby's pre-existing license revocation. That revocation was a sufficient reason for the State of Alaska to deny Busby the right to use his international driving permit on the roads of this state.

*Busby's alternative argument that even though his prior license revocation was a sufficient reason for the State of Alaska to withdraw his right to use his international driving permit, the State was obliged to initiate a new judicial or administrative proceeding for this purpose.*

■ Article 24, Section 5 of the Convention on Road Traffic declares that, under certain circumstances, a signatory country need not honor its promise to allow all drivers possessing international driving permits to use its roads. A signatory country can "withdraw [a driver's] right to use [an international driving permit]" within its territory if the driver has committed a driving offense that would entail loss of driving privileges if committed by a resident of that country.

Busby points out that, even if we assume that his pre-existing license revocation provided the State of Alaska with a valid reason to withdraw his right to use the international driving permit, the State never initiated official action against Busby's permit. Busby argues that even though Article 24, Section 5 authorizes a signatory country to withdraw a person's right to use an international driving permit, the permit remains in force until the

---

4. *See id.* at 301.

5. *Id.* at 301–02.

6. *See id.* at 302–04.

country initiates official proceedings for this purpose.

Again, we find that Busby's interpretation of the Convention is untenable because it leads to results that are at odds with the objectives and purpose of the Convention on Road Traffic. According to Busby's interpretation of the Convention, after a person's driver's license is revoked by one signatory country, the person would be entitled to move to a new country, obtain an international driving permit under the laws of that country, and then resume driving in the first country unless and until the first country realized what had occurred and initiated judicial or administrative proceedings to withdraw the person's right to use the permit. Under this interpretation, drivers could obtain new international driving permits and then play a game of "cat and mouse" with the countries that had previously suspended their licenses, hoping that their renewed driving within those countries would remain undiscovered. If the signatory countries had thought that the Convention led to these results, they would not have signed the Convention.

Busby nevertheless argues that his interpretation is supported by the wording of Article 24, Section 5. As explained above, Article 24, Section 5 contains two sentences. The first sentence declares that, under certain circumstances, a signatory country need not honor its promise to allow all drivers possessing international driving permits to use its roads. A signatory country can "withdraw [a driver's] right to use [an international driving permit]" within its territory if the driver has committed a driving offense that would entail loss of driving privileges if committed by a resident of that country. The second sentence of Section 5 adds that a country withdrawing the use of an international driving permit "may withdraw and retain the permit" until the period of revocation expires or the driver leaves its territory, whichever occurs first.

This double use of the word "withdraw" creates some ambiguity in the English text of the Convention on Road Traffic, and this ambiguity arguably provides some support for Busby's contention that his international driving permit remained in force until the State of Alaska took some positive action to "withdraw and retain it". However, the Convention on Road Traffic was issued in both English and French (the two official languages of the United Nations), and the French text of Article 24 does not contain the ambiguity found in the English version.

*Interpreting a treaty written in two languages*

Before we examine the wording of the French text, we should address the rules that govern interpretation of a treaty written in two languages.

Article 33 of the Vienna Convention on the Law of Treaties [7] states that "[w]hen a treaty has been authenticated in two or more languages, the text is equally authoritative in each language, ... [and][t]he terms of the treaty are presumed to have the same meaning in each authentic text." [8] If there is an arguable discrepancy between the two versions, Article 31, Paragraph 1 of the Convention declares that the "treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of [the treaty's] object and purpose." Moreover, Article 32 states that an interpretation should be rejected if it "leaves the meaning ambiguous or obscure; or ... leads to a result which is manifestly absurd or unreasonable". Finally, "when a comparison of the authentic texts discloses a difference of meaning which the application of [A]rticles 31 and 32 does not remove," Article 33 directs a court to adopt "the meaning which best reconciles the texts, having regard to the object and purpose of the treaty".[9]

The United States has not signed the Vienna Convention on the Law of Treaties. Moreover, by its own terms, the Vienna

7. 1155 United Nations Treaty Series 331; 8 International Legal Materials 679. The Vienna Convention was issued in 1969 and went into force on January 27, 1980.

8. *Id.*, Article 33, Paragraphs 1 and 3.

9. *Id.*, Article 33, Paragraph 4.

Convention does not apply to treaties concluded before January 27, 1980 (the date the Convention went into force).[10] However, as the Fifth Circuit noted in *Kreimerman v. Casa Veerkamp, S.A.*, "Although the United States is not a party to the Vienna Convention, it regards the substantive provisions of the Vienna Convention as codifying the international law of treaties."[11] Or as the Washington Supreme Court stated in *State v. Pang*, the Vienna Convention "is accepted as the authoritative guide to treaty law and practice and declaratory of customary international law".[12]

In other words, both federal and state courts have acknowledged and employed the principles of interpretation codified in the Vienna Convention.[13] We will too.

### The French text of Article 24, Section 5

In the French text of the Convention on Road Traffic, the first sentence of Article 24, Section 5 parallels the English text: it declares that a signatory state (or one of its subdivisions) *"peut retirer"*—*i.e.*, can withdraw or retract [14]—a driver's right to use an international driving permit if the driver has committed a driving offense that could entail the loss of driving privileges for a resident of that country:

> Un État contractant ou une de ses subdivisions ne peut retirer à un conducteur le droit de faire usage d'un des permis visés ci-dessus que si ce dernier a commis une infraction à la réglementation nationale en matière de circulation susceptible d'entraîner le retrait du permis de conduire en vertu de la législation dudit État. . . .

But the second sentence of the French version does not suffer from the same problem as the English text (the double use of the word "withdraw"). Instead, the second sentence of the French text declares that a country or political subdivision that withdraws a driver's right to use an international driving permit *"pourra se faire remettre le permis "*—*i.e.*, may require surrender or delivery of the permit [15]—and may retain the permit until the period of suspension has expired or until the driver leaves the country, if that occurs first:

> En pareil cas, l'État contractant ou celle de ses subdivisions qui a retiré l'usage du permis pourra se faire remettre le permis et le conserver jusqu'à l'expiration du délai pendant lequel l'usage de ce permis est retiré au conducteur, ou jusqu'au moment où ce dernier quittera le territoire de cet État contractant, si son départ est antérieur à l'expiration dudit délai.

Thus, the French text of the Convention clarifies that a country's (or a state's) act of withdrawing a driver's right to use an international driving permit on its roads is distinct from any action the country or state may take to secure physical custody of the permit. If a country or state has withdrawn a driver's right to use the international driving permit, it may *also* require the driver to surrender the permit until the driver's right to drive is restored or until the driver leaves its territory. But this follow-up action (securing physical custody of the permit) is an additional remedy available to the country or state under the Convention. The legality of the country's or state's initial action (withdrawing the driver's right to drive within its territory) does not depend on whether the

10. *See id.*, Article 4.

11. 22 F.3d 634, 638 n. 9 (5th Cir.1994) (citing Restatement (Third) of the Foreign Relations Law of the United States, Part III, introductory note (1986)).

12. 132 Wash.2d 852, 940 P.2d 1293, 1322 n. 88 (1997) (citing S. Exec. Doc., 92 Cong., 1st Sess. 1 (1971); Marian L. Nash, *Contemporary Practice of the United States Relating to International Law*, 75 Amer. J. Internat'l Law 142, 147 (1981)).

13. *See Kreimerman*, 22 F.3d at 638 n. 9; *Pang*, 940 P.2d at 1322 n. 88. *See also State v. Martinez-Rodriguez*, 130 N.M. 853, 33 P.3d 267, 273

n. 3 (2001); *United States v. Royal Caribbean Cruises, Ltd.*, 11 F.Supp.2d 1358, 1369 (S.D.Fla. 1998); *National Coalition Government of Union of Burma v. Unocal, Inc.*, 176 F.R.D. 329, 345 (C.D.Cal.1997).

14. *See* Denis Gerard *et al.*, *The New Cassell's French Dictionary* (Funk & Wagnalls, 1965), p. 649.

15. *See id.*, pp. 335 (*"se faire "*) and 634 (*"remettre "*).

country or state forces the driver to surrender physical custody of the international driving permit.

*Reconciling the English and French versions of Article 24, Section 5*

Busby's case does not involve a direct inconsistency between the English and French versions of Article 24, Section 5. Rather, the problem in his case stems from an ambiguity in the English text (the double use of "withdraw"), an ambiguity that might arguably make the English text inconsistent with the French text. In such instances, we are to presume that the two versions of the treaty have the same meaning.[16] This principle directs us to resolve the ambiguity in the English text in favor of the clear meaning of the French text.

Moreover, in ascertaining the presumed unitary meaning of Article 24, Section 5, we are obliged to adopt the interpretation that best reconciles the two versions ‑in light of the Convention's objectives and purpose.[17] And we are to reject an interpretation that "leads to a result which is manifestly absurd or unreasonable".[18]

As we noted earlier, construing Article 24, Section 5 as Busby proposes would lead to results that are at odds with the objectives and purpose of the Convention on Road Traffic: drivers could obtain new international driving permits and then play a game of "cat and mouse" with countries that had previously suspended their licenses. If the signatory countries had thought that the Convention led to these results, they would not have signed the Convention.

 For these reasons, we conclude that Article 24, Section 5 means what the French version clearly says: a signatory country (or political subdivision, such as a state of the United States) can withdraw a person's right to use an international driving permit within its borders. In such cases, the country or state may additionally require the surrender of the international driving permit until the person's right to drive within that country or state is restored, or until the person leaves the territory of that country or state (whichever occurs first). But when a signatory country relies on a pre-existing license suspension or revocation as the basis for prohibiting a driver from using its roads, the signatory country's authority does not depend on whether that country has initiated new proceedings against the driver or the international driving permit, nor does it depend on whether that country has required the driver to physically surrender the permit.

We further hold that, because of Busby's pre-existing license revocation, the State of Alaska could prospectively withdraw Busby's right to use his international driving permit on the roads of Alaska, without the need for a new judicial or administrative proceeding.

*Summary of our conclusions regarding Article 24, Section 5 of the United Nations Convention on Road Traffic*

Under Article 24, Section 5 of the Convention on Road Traffic, signatory countries (and their political subdivisions) retain the right to enforce license suspensions or revocations, even when the motorist whose license was suspended or revoked later obtains an international driving permit from another government. If, during the term of the suspension or revocation, the motorist returns to the country or state that imposed the suspension or revocation and drives a motor vehicle within its territory, that country or state can prosecute the motorist for driving with a suspended or revoked license.

Busby's Alaska driver's license was revoked while he was living here. Even though Busby later obtained a valid international driving permit from another government, his driver's license remained revoked in the State of Alaska, and the Convention on Road Traffic does not bar the State of Alaska from enforcing Busby's pre-existing license revocation.

**16.** Vienna Convention on the Law of Treaties, Article 33, Paragraph 3.

**17.** *Id.*, Article 31, Paragraph 1; Article 33, Paragraph 4.

**18.** *Id.*, Article 32.

Thus, even though Busby possessed an international driving permit, he could not lawfully drive within the borders of this state. Accordingly, we uphold the State of Alaska's authority to prosecute Busby for driving with a revoked license.

### Busby's remaining arguments

Busby asserts that the trial judge committed three errors during his trial that require reversal of his conviction. The first two alleged errors involve Busby's attempt to argue to the jury that he should be acquitted because he mistakenly but in good faith believed that he was entitled to drive in Alaska despite the fact that his license was revoked.

First, Busby contends that the trial judge improperly limited Busby's testimony concerning his efforts to research the Convention on Road Traffic—specifically, his research into whether his international driving permit gave him the right to drive in Alaska even though his Alaska driver's license was revoked. Apparently, the trial judge allowed Busby to generally describe his legal research to the jury, but the judge prevented Busby from going into detail about the specific sources he consulted and what he gleaned from those sources.

Second, Busby contends that the trial judge committed error by instructing the jury that "it is no defense that [Busby] believed [his act] to be lawful".

Both of Busby's arguments are premised on his assertion that, in a prosecution for driving with a revoked license, the government was obliged to prove that Busby acted with "knowledge" of his license status. Busby's arguments are further premised on the assumption that the term "license status" includes the legal relationship between his revoked Alaska driver's license and his later-issued international driving permit. Both of these premises are incorrect.

In prosecutions for driving with a suspended or revoked license, the government must indeed prove that the defendant acted with a culpable mental state regarding the fact that their license was suspended or revoked, but that culpable mental state is "criminal negligence", not "knowledge". We expressly held in *Gregory v. State*, 717 P.2d 428, 431 (Alaska App.1986), that "proof of criminal negligence is the required mental state to show a violation of AS 28.15.291".

In other words, the State did not need to prove that Busby was subjectively aware that his license was revoked. Indeed, the government did not even have to prove that Busby was subjectively aware of a *risk* that his license was revoked. Instead, the State merely had to prove that a reasonable person in Busby's position would have been aware of a substantial and unjustifiable risk that Busby's license was revoked, and that Busby's failure to perceive this risk constituted a gross deviation from the standard of care that a reasonable person would exercise in those circumstances.[19]

But this is all beside the point. Busby admittedly knew that the State of Alaska had revoked his driver's license. That license revocation was what prompted Busby to research the law concerning international driving permits and the United Nations Convention on Road Traffic. Rather than claiming ignorance of his license revocation, Busby wanted to tell the jury about his understanding of the *legal effect* of that revocation. He wished to testify that, based on his legal research, he believed that his international driving permit entitled him to drive in Alaska despite the fact that his license was revoked.

AS 11.81.620 declares that a defendant's "knowledge, recklessness, or criminal negligence as to the ... meaning ... or application of the provision of law defining an offense ... is not an element of [the] offense unless the provision of law clearly so provides." AS 28.15.291(a), the statute defining the crime of driving with a suspended or revoked license, does not specify that the government must prove anything about the defendant's subjective understanding of the effect or scope of the license suspension or revocation. Instead, the government must prove that the defendant knew or should have known that the suspension or revocation had occurred. Therefore, it was irrelevant whether Busby had researched the Conven-

---

**19.** *See* AS 11.81.900(a)(4) (the definition of "criminal negligence").

tion on Road Traffic, and it was likewise irrelevant whether Busby had mistakenly concluded, based on this research, that his international driving permit authorized him to drive in Alaska despite the fact that his Alaska license was revoked.

We recognize that Busby's trial judge ruled that Busby had a right to testify about these matters (although, as explained above, she limited the scope of Busby's testimony). The trial judge relied on our decision in *Cornwall v. State*, 915 P.2d 640 (Alaska App. 1996). But *Cornwall* involved a prosecution for custodial interference[20], an offense that expressly requires proof that the defendant took or kept a child *knowing* that the defendant had no right to do so.[21]

In *Cornwall*, the question was whether the trial judge should have allowed the defendant to present testimony concerning the defendant's mistaken understanding of certain child custody orders. We explained that this testimony was admissible because it was relevant to the issue of the defendant's state of mind—and because one of the elements of custodial interference is the defendant's state of mind.[22] But we noted that this same testimony would *not* have been admissible if it "had been offered for the purpose of convincing the jury that ... there was a substantial possibility that [the child custody] orders had no legal effect on Cornwall"—because "[t]he legal effect of the superior court's custody orders was an issue of law to be decided by the trial judge".[23]

Busby's case is governed by this latter rule. Busby's understanding of the legal effect of his international driving permit—specifically, how that permit related to his revoked Alaska driver's license, and whether it authorized him to drive in Alaska despite his license revocation—was not an element of the offense. Rather, this was an issue of law to be decided by his trial judge. The trial judge committed error when she allowed

Busby to offer any testimony on this issue at all—but the error ran in Busby's favor.

For these same reasons, the trial judge correctly instructed the jury that even if Busby believed that his act of driving with a revoked license was lawful, this was no defense.

■ Busby's third and final claim is that the trial judge should not have instructed the jury on "motive". The judge's instruction read:

Motive is not an element of the crime charged and need not be shown. However, you may consider motive or lack of motive as a circumstance when considering the charge. You may give the presence or absence of motive, as the case may be, the weight to which you find it to be entitled.

Busby contends that there was no evidence at his trial on the issue of whether he had any particular motive in driving while his license was revoked. He therefore argues that the motive instruction was "misleading" and "confusing", and that it "divert[ed] the jury's attention" from the true issues in the case.

Motive was, in fact, raised tangentially at Busby's trial: the State argued that Busby was motivated to obtain an international driving permit because he knew that his Alaska driver's license had been revoked. Thus, there was some reason to instruct the jury on the legal significance of motive. But even leaving this aside, Busby has not shown how the challenged instruction could possibly have prejudiced him.

*Conclusion*

Although Busby had an international driving permit issued under the provisions of the United Nations Convention on Road Traffic, he still could not lawfully drive in Alaska while his Alaska license was revoked, and the State was therefore authorized to prosecute

---

20. AS 11.41.320(a).

21. *See Cornwall*, 915 P.2d at 648. *See also Strother v. State*, 891 P.2d 214, 223 (Alaska App. 1995).

22. *Cornwall*, 915 P.2d at 648–49.

23. *Id.* at 647.

Busby for driving with a revoked license. Moreover, Busby's mistaken belief that the international driving permit authorized him to drive in Alaska despite the license revocation was no defense to this charge. Accordingly, the judgement of the district court is AFFIRMED.